First case on today's list, the case of Giant Eagle Inc v. Comm IRS. Mr. Barnes. Thank you, your honor. May it please the court, my name is Robert Barnes, I'm counsel for Appellant Giant Eagle. With me as co-counsel is my tax partner, Mr. Richard Halpern. I would like to present five points to the court today. Do you want to reserve any time for rebuttal? I'm sorry, yes, three minutes. Thank you. That request will be granted. I'd like to cover five things about this fuel perks program. The first thing I'd like to cover is the IRS concessions, which have narrowed the issue in this case to one single issue, that being whether the obligation to honor fuel perks became fixed during the taxed years in question. The second thing I'd like to do is cover the actual terms of the contract between Giant Eagle and its customers, which I've had blown up. One of the program guides that was handed out to the customers in the tax years in question, which I've provided handouts to the court, which in simple terms provide all of the key terms of the fuel perks program. The third thing I'd like to talk about is Giant Eagle's accounting. Giant Eagle's accounting is important because under the Internal Revenue Code section of issue, Congress requires the IRS to consider the accounting and financial statement treatment that the taxpayer employs in dealing with the issue for generally accepted accounting principles. And under those principles, the accruals at issue were required. The fourth point I'd like to mention is the trade stamp, which is an alternative argument in the event that these fuel perks are not binding unilateral contracts. When the customers purchase groceries in the alternative, they qualify for deduction treatment under the trading stamp or premium coupon regulation, which is a decades-old regulation that allows for deduction. And finally, I'd like to call the court's attention to the recently-issued opinion of the Federal Circuit Court of Appeals in Mass Mutual, which I filed with the court yesterday, which is an affirmance of a decision discussed in our briefs in which the Federal Circuit Court of Appeals affirmed the Federal Court of Claims, finding that an insurance company's mere declaration of dividends on policies established a fixed liability. Even if the declaration was revocable and even if it might not even be enforceable under state law. We believe that we meet the enforceability prong of the test, but that's a lower standard that the Federal Court of Appeals for the Federal Circuit has just set. With respect to the IRS concessions, we have five essential concessions in this case. We're dealing with the all-events test, which is a tax accrual test. It has three prongs. The liability has to be fixed. It has to be determined with reasonable accuracy. We're really just dealing with fixed liability. That's the focus. Am I correct in understanding that if your facts are more like the Hughes case, you lose, and if your facts are more like the General Dynamics case, you lose? Well, I understand where the Court is coming from on that issue. General Dynamics was the 1989 decision, I believe, of the U.S. Supreme Court dealing with medical expense claim forms. And in that case, the Supreme Court held that until the medical claim form was filed with the plan provider, there was no fixed liability. But that dealt with issues of privacy and submitting medical information to a plan provider, etc. Since that decision, the IRS, as an administrative practice, has winnowed down General Dynamics such that a liability can be fixed even if a claim form has to be submitted later. And that's in a series of revenue rulings and private rulings, which are citable by parties to show the administrative practice of the IRS. So to answer your question, Judge Hardiman, it's not so much General Dynamics standing alone would defeat our claim. We would say, to the contrary, that General Dynamics, as interpreted by the IRS, indicates that when our customers come to redeem their fuel perks, it's just a mere technicality. It's just the convenient way in which they cash out what they earned in the grocery stores. And, in fact, in the... the company has no obligation to pay the customer that $0.30, correct? Actually, we would respectfully disagree. The obligation, we believe, arises when the customer has complied with our simple statement in the program, which is on the cover and is on the second page. So if you stopped the perks that a customer who was holding perks could sue you for... Yes. Yes. Because under federal and state unilateral contract law, we made a promise, you come into our stores and you buy $50 worth of groceries, you have earned, and we use language of earning in these brochures, you have earned a fuel perk. So in 2006-2007, how many fuel perks in dollars were earned but unused? You mean at year end? Yes. We're dealing with $10 to $11 million in accruals. Well, no. I mean, I thought your history showed that about 91% or 90% would actually be redeemed. Is that right? The actual redemption rates are extremely high for a grocery marketing program like this. They go between 91% and 93%. All right. So there's an 8% or 9% there. What's the dollar value of that 8% or 9% for the two tax years in question? I don't know the exact number, but I do know that we're dealing with accruals in the range of $11 million. In the first year, the IRS is attempting to force us to reverse an accrual. So those customers that didn't redeem their fuel perks, if they filed a class action against the company, the company would have to pay them that $11 million in cash? Yes, because to get to your point about termination of the program, we never reserved the right in any way in this contract to terminate retroactively. All of the testimony at trial was that the language of this provision was simply to say at some point we may terminate this program, but it would be prospective only. But you're saying it's still one of the fuel perks? We have. We always have. In fact, we have cashed out customers on fuel perks. Even after the three-month expiration? Oh, yes. We've had instances where customers have earned hundreds of dollars on fuel perks by buying gift cards and things of that nature, and we've cashed them out of the program because the program was never intended for that kind of abuse. So we've always honored the fuel perks regardless of the conduct, regardless of how they were earned. Regardless of the length of time? Yes. Yes. In fact, you can call it that. But that might be a goodwill gesture as opposed to a contractual gesture, would it not be? Right. But under the Abbott decision and under this Court's Kemmerer decision, in order to retroactively take away benefits earned under a contract pursuant to an amendment provision in the contract, you have to say we can not only end this program, but we can also take away what you've earned. And we've never said that. We've never intended it. The only witnesses at trial were Giant Eagle witnesses, and they all uniformly testified. Let me roll to the next tax year. You want to deduct these unredeemed fuel perks in 2006 and 2007. Assume, under your theory, that the deduction is fixed and the contract unilaterally was entered into when the groceries were purchased. How do you treat, for accounting purposes, the fact that within 90 days of the end of the tax year, the customer shows up and redeems the fuel perks? How do you treat that? We relieve the balance sheet accrual, which has no effect on the income or the expenses of the company because it was expensed in the prior year. Exactly. So when they actually come in within the next three months after year end, there's no expensing of that fuel perk in that year because it was expensed in the prior year. I come in during that three month period and gasoline is selling at $3 a gallon, and I have a dollar's worth of fuel perks, and I purchase 20 gallons of gas. My gas is reduced by the amount of my fuel perks, so I don't pay the full $3 a gallon for the 20 gallons of gas. How do you treat that sale? I can answer that, but I have to say one thing before I answer that, and that is we have 70 independent owners, so it's not just Giant Eagle. I know. You have other people who have issued fuel perks. Right. The independent stores, every fuel perk earned at every one of those independent stores gets expensed to that store immediately when the customer goes into the store and complies and buys the $50 worth of groceries. Then those stores have nothing to do. So they sell $50 worth of groceries, but there's also an expense. They get hit with that expense. They get hit with that expense every year, so they don't really get $50 from the groceries. They get $50 less the fuel perk. Right, because it's an expense that directly matches the sale that generated. Do you want to be able to deduct that? Do you understand the IRS, to the extent that those are our fuel perks, we want to be able to deduct that from that year? Correct, because we believe, both under generally accepted accounting principles and under tax accrual precedent, that that's the proper match. Okay, but I'm talking about the next year. I just bought $60 worth of gas, but I have fuel perks. How do you account for that sale at the station? At the gas station, the purchase at the gas station, the accounting for that is between the gas station and Giant Eagle, because you purchase gas, and the price of gas has nothing to do with this program at all. I understand that. Okay, so you come in, you buy gas, and you get $10 off your gas. The gas station books the entire sale as if there was no credit, and then charges Giant Eagle to pay the fuel perks through intercompany journal entries. But if it's Giant Eagle's gas station, which a lot of them are, all of them are. Don't you have to go to Getco? You do go to Getco to redeem. Are you saying some of the Getcos are privately owned? No. All of them are Giant Eagle stations. Right. Sorry. But the important point is that the 70 independent stores, all they get hit with is the fuel perks because the groceries were purchased at those stores. I understand that, but I'm trying to figure out how you account for it in the subsequent year. You said if I spent $60 of gas, you're booking the entire $60 as a sale. The gas station is booking it because it's a separate entity. So it charges, it's as if you paid full, but you didn't pay full, so the $10 you got off is charged to Giant Eagle. It's a payment of the fuel perks. So that gas station where I buy the fuel is not the same corporate entity that is part of this suit? It's an affiliate of Giant Eagle, but it is a separate legal entity. It's a separate legal entity. It's a separate legal entity. Okay. So they have accounting that has to go between those two. All right. You answered my question by describing it as a separate legal entity. What if Judge Fisher moves to Timbuktu and never redeems his gas perks? How is that accounted for? Well, we actually do in our calculation, the second prong, the reasonable accuracy, he would be part of the 7% to 9% of people that we know aren't going to redeem. And so we never accrue for it. See, the system is set up so we're not trying to accrue for things that we don't think are ever going to get paid. Built into our system is only accrue for what we know is going to get paid. And it's almost perfectly precise. It's a much better system than the Third Circuit's decision way back in 1971 in Lukens where you allowed the accrual of a liability for unemployment benefits. Someday in the future, it was unknown when they would be paid, to whom they would be paid, and how much would be paid. In that case, the Third Circuit said that's a fixed liability because you agreed to pay it. We're saying we're even better than Lukens because we know by a fully computerized program, each and every customer, how much you earned, how much Judge Fisher earned, how much Judge Hardiman earned. And we know from recent statistics that approximately 93% of the fuel perks everybody earns are going to be redeemed within 90 days of year end. So we only book the 93%, and we don't even try to book or deduct the 7% that we know aren't going to be redeemed. So there's a perfect match, almost a perfect match. It's almost a perfect match because... And that shows why you win on the second prong. But it doesn't really help us on the fixed liability prong. The fixed liability prong, first prong, is a legal analysis, right? Well, it's a... And it really seems to come down from reading the briefs. It comes down to what the measuring point is, right? If it's a unilateral contract that's accepted when the customer goes and buys the gas, then the government should win. If it's a unilateral contract that's consummated once the customer buys the groceries, then you should win. Is that fair? I would agree with that, but I would also say that we would win even in the other circumstance. How? Because under Third Circuit, the Kemmerer decision and the transportation workers decision, under federal common law, the unilateral contract is triggered when you begin performance, not when you end performance under state law. So under transportation workers, federal common law of contracts, when the customer comes into the store and begins this whole series of transactions, we would say the unilateral contract is formed at the instant he buys the $50 worth of groceries. And at a minimum, if you say something has to occur, you have to go to the gas station, under federal common law of contracts, the contract has already been formed. And you rely on COBA versus Click Lewis for that analysis? That's a state unilateral contract. That was the Golfer case. Right. So the Golfer gets the hole-in-one, the unilateral contract is consummated once the ball goes in the cup, is that it? Yes, that was the hole-in-one. So then if the Golfer doesn't go to the dealership and buy the car for the sticker price plus $49, the dealership has a cause of action against the Golfer for breach of contract? No, under unilateral contract, the offeree can elect to perform or not. The question of when the liability is triggered is when they perform, the act requested. And that's the rub of this case, right? Is the act requested the ball going into the cup or is the act requested the successful hole-in-one Golfer going to the dealership and saying I want to take advantage of this offer that you had made and I want the car for $49 over sticker? Well, I think the program brochures explain exactly, if I can walk over here. Actually, you're better off recording. I'm sorry. We have it in front of us. If you look at the cover of the brochure, it says in simple terms spend $50 with your advantage card aside Giant Eagle and get-go. You can also earn it by buying things at get-go and earn $0.10 off every gallon of gas on your next fill-up. That's the contract. That's it right there. That's all you have to do. The act of redemption is just something that's fully computerized and as easy as can possibly be in the modern age. It's just simply flashing your advantage card and hitting the yes button. Isn't there an option, though, for the customer? The customer has an option to go redeem it. Now, obviously, most people are. I don't know why people wouldn't unless maybe they have a different gas station they want to go to. Well, the astoundingly high redemption rates indicate that people want it. They redeem it almost immediately. We give them three months to redeem it. There's very little non-redemption. So that's what happens in practice, but as a legal matter, isn't there an option? Why isn't it an option contract for the customer? Well, it isn't under, again, federal common law of unilateral contracts. In the Transportation Workers' Decision, the Third Circuit held that under the restatement, following the restatement, under the unilateral contract, when the offeror says to the offeree, do Act X and I will do Y. As soon as the offeree begins Act X, there's an option contract form that prevents the offeror from pulling back and saying, no, no, no, stop, stop, stop. I don't know. Can that be right, though? The textbook case for unilateral contracts is if you walk across the Brooklyn Bridge. Correct. Yeah, that's a good brief. We all heard that one. You're saying that when you say to me you'll pay me $100 if I walk across the Brooklyn Bridge, as soon as I step foot on the bridge, I'm performed? Under federal… I thought I could get all the way to the other side. Well, it depends. It's a nuance between state and federal common law of contracts. The Pennsylvania state courts, whenever they talk about… We're looking here at Pennsylvania law. This case is being decided under Pennsylvania law. Well, we've advanced that as a ground for holding for us. But alternatively, this is a federal income tax case, and I believe that the court could also, as an option, follow the federal common law of contracts and say that as soon as you begin performance, the contract is enforceable. But you don't need to look any further than the program guide, which is the contract. We say this is what you have to do, and we owe it to you. And that's like in the Massachusetts mutual case that just came out, where the board of directors of the insurance company said, We hereby declare a dividend. And they booked it, and it was a dividend for the following year. And the federal circuit said, that's an obligation. But notwithstanding the subsequent revenue rulings, that might be in conflict with general dynamics. Well, general dynamics was discussed in the decision. And interestingly, in the lower court, the federal court of claims in that case, the court said, you know what, it doesn't even have to be enforceable under state law. That's how low the standard… In fact, it's not even in the regulations or the Internal Revenue Code as to what the liability is. Does it have to be enforceable under state law? We say if that's the test, we clearly need it. But the federal court of claims is suggesting that that's not the test, and it's actually much lower. As long as there is a contractual expectation, you can book the liability. And under generally accepted accounting principles, everybody who testified at trial, including the outside auditors, Ernst and Young, they said it was mandatory that we had to book this under generally accepted accounting principles. And under the regulations, and in the Internal Revenue Code, Congress says you have to consider how the taxpayer is treating it on their books. And we are. Okay. No questions asked. We understand that. We'll have you back on rebuttal, Mr. Barnes. Let's hear from this… Thank you, Your Honor. Mr. Barnes went over his time, so if he needs some additional time, we'll show equal leniency there. Thank you, Your Honor. Food Perks are not a contract, Your Honor. Food Perks are not a rebate. They are compounds… You need to make sure those microphones are picking up your voice. They are compounds… Am I audible? Keep trying. They are coupons for a sale that hasn't happened yet. And no one is obligated and no one absorbs any cost until the discount is claimed on the second unrelated purchase. What the taxpayer has suggested… We just heard from Mr. Barnes they absorb a cost at the grocery store as soon as the purchaser buys the groceries. They have made the election so to treat it on their books. But as a matter of fact, there is no deference actually due to their allocation of costs on their books within a controlled group of corporations. There's one taxpayer here. Judge Fischer was asking earlier whether the corporate organization had an effect on where the cost was ultimately sustained, whether it was a get-go or a Giant Eagle retail outlet. And because all of those funnel up through a single point taxpayer, as a matter of tax law, that does not do any deference. They are entitled to keep their books how they will in accordance with generally accepted accounting principles. That does not obligate the IRS to act in a manner inconsistent with the principles of federal income tax law, which hearsay that the liability is not fixed until the discount is claimed. Why isn't this a unilateral contract as it was entered into at the time? For the reasons that Your Honor has already observed. There is a right to revoke at any time. The fact that they didn't do so does not mitigate that right. They say that's prospective though. Were there any fact findings in the record about that? Put another way, would you agree that there's a difference if they were to revoke it for future purchasers but yet had to honor it for those that had already bought the groceries? I don't believe that there were any fact findings below that they had to honor discounts that had been issued but unclaimed. The facts did indicate that they did do so and even in the case of abuse of the system, they are a good corporate system. What does that really have to do with the unilateral contract question? In the government's position, very little because the way we view the contract is through the lens of an option. Who is the offeror and who is the offeree? What they are suggesting here is that the offer is what is written on this brochure. Spend $50 and earn $0.10. You spend $50, you get $0.10. But the performance there is not the purchase of groceries because what have you earned? Let's say you spend $50. You walk out with your groceries and you walk out with $50 worth of groceries and you walk out with $0.10. You don't have that as time transfer. In theory, you have a coupon for a discount on a subsequent purchase of gasoline. Maybe you don't feel a dead go. Maybe there is a BP by your house. As I understand this, they took into account by their discounting the number of people who walk out with a $0.10 coupon and don't redeem it. They took that into account. Do you agree with that? Yes, Your Honor. I believe we described the mechanism that they used to compute the estimated contingency. Why isn't the contract over? I bought the groceries. I have $0.10 off. I'm not going to go to BP and pay $0.10 more for my gas. I'm going to go where my gas is cheaper. BP may have a lower retail price. Safeway does the same thing in Washington. I take good advantage of it. Safeway has different terms, Your Honor. I realize that. I, too, use that program. But here, the government suggests that the contract is not accepted until the second purchase, until you redeem that coupon. So it's all about the timing. It really is all about what the triggering event here is. It can seem that if the purchase of the groceries is the triggering event, you lose. If the triggering event is taking advantage of the discount when you fuel up, then you should win. Correct, Your Honor. How do you decide? There's not a lot of case law in this. Is it really a matter of us trying to analogize between Hughes and General Dynamics? Is that all we really have to go on here in fixing which is the appropriate triggering event? I think the paucity of case law on discount coupons tells the story that you need, which is that this has never been suggested to be a unilateral contract. Imagine the breadth and volume of class action case law that would come before this court and other courts if every discount that was issued at a point of sale, creditable toward a subsequent purchase, was grounds for certification of a class action. They just admitted they owe $11 million to the people. I don't know if we have any class action lawyers here, but they just admitted that they owe $11 million to the people that didn't redeem their fuel purse. The government doesn't see it that way. We would not suggest that they owe $11 million. We would suggest that the coupon by its term expires in three months. Let's talk about the tax year. Let's go back to the grocer again. He sells $50 worth of groceries, so he got his $50. But he really only gets $49.40 because that $0.10 is going to be deducted from his income. Why should he deduct that in the year of the sale? Because, first of all, the coupon is $0.10 per gallon, ultimately purchased. It's not a simple $0.10. I know, it's $0.10 per gallon. I understand. $0.10 per gallon, so it's going to be $2. Okay, so my math was wrong, but my concept was still sound. So he gets $48.00. Why should he take that deduction in the year he sold the groceries? Because he doesn't get $48.00, Your Honor. He gets $50.00. The get-go station is the one that actually eats the cost of that discount. It eats it at the point of sale. It eats it based on how many gallons of gas you purchase. That's the real world, but in the accounting world, which I'm certainly no expert in, it's the other way around. He's an accrual taxpayer. That is the choice that they have made here. But why isn't that choice a commissible choice? As you say... Because you can't prove a liability that isn't fixed, Your Honor. All right, that's what your regulation says. So the problem is when the purchaser gets $50.00 worth of groceries, they don't know whether to book that as $49.90, $49.10, or for some of the people that hoard their fuel perks, $40.00. Precisely, because it's unknown at the time of the sale of groceries. What's the record show? Because Mr. Barnes said that they do, as an accounting method, the grocer takes the hit as an accounting method. The grocer does take the hit as an accounting method. How do they fix that if there could be this wide disparity between $49.90 and $45.00? In our brief, we describe the method they use to estimate the contingency, and as Mr. Barnes has stated, and we don't dispute, the reasonableness of their computation is not at issue. They do have good statistics on historical performance and historical redemption, and it is a fairly simple and uncomplicated mechanism when the purchaser actually do choose to claim your discounts at the point of purchase of gasoline. What is unknown, and what makes accrual inappropriate here, is the extent and the timing of that ultimate cost. And what they have done in the course of estimating, and we describe this in our brief, is they guess. They will guess that they'll take the total number of groceries sold, they'll divide it by 50, and obviously there are groceries that are excluded from this, but qualifying groceries divided by 50 gets you the outstanding number of discounts earned. Now, as a simple rule of thumb, it's easy to say each one of those is worth $0.10, but it isn't, and this is where the contingency gets complicated, because it's worth $0.10 per gallon at a particular point in time, and you don't know how many of those gallons are going to be purchased that day, you don't know how many additional discounts are going to be accumulated and redeemed at the same time, and you don't ultimately, as a result, know what the purchase price is going to be at that second sale. That is when the liability in a federal context would become fixed, irrespective of state contract law, and that is where you would know what to book, rather than guessing. Let's look at your regulations and how you interpret this, which is, in essence, a basis for your disallowance. Under the recurring item exception, Okay. Under the recurring item exception, why isn't the better match for this cost in the tax year in which the groceries are sold? For the reasons I've just stated. The income comes from the purchase of gas. That is when the discounted purchase price is paid. That is when the value of these accumulated discounts is realized. But GetGo is not going to suffer any decrease in income from the Uber because they get reimbursed by Giant Eagle, and basically it is Giant Eagle charging against the $50 income it gets in, the liability that it has created at that moment. I believe, Your Honor, that the record indicates there that that election was made deliberately because fuel is a much lower margin business than groceries, and because there was room in the grocery budget to absorb that loss where, had it been booked at the gas station level, that would have resulted in paper losses for the GetGo stations. The actual absorption of the cost is done from a tax accounting purpose. Remember, we're talking about a single taxpayer here. It is absorbed before the tax is paid, and their election to accrue it where it would fit on the books as a function of grocery sales does not alter the reality that they're not obligated. There is no obligation to pay on that discount, no obligation to honor it by reducing the purchase price of fuel until fuel is purchased, regardless of where it goes in the books. We're going to talk about trading stamps, but why are you saying this is a coupon? Why is this not a trading stamp? First of all, Your Honor, you can't trade it. They're not subject to... Well, you trade it for gas. You can redeem it for a reduction in the purchase price of gas. It is, in theory, possible to accumulate sufficient discounts to reduce that price to zero, and as a matter of estimation, someone probably did, but the taxpayers' computer systems did not track that, and at trial they were not able to produce evidence of any particular instance where gasoline was actually given for free. But you just said that how they arrange their accounting is not going to affect your opinion of how it ought to be charged. That's correct. So aren't you contradicting that earlier statement by saying that they didn't account for it right to be trading stamps? Well, there are several answers to that question, Your Honor. First of all, to treat it as a trading stamp would require a net against gross receipts as opposed to treatment as an expense. That, as a threshold matter, is an affirmative election that the taxpayer must make as an accounting matter, and the taxpayer here has not done so, which is why it's an alternative argument for them. Secondly, there is not... When you are absorbing the cost of a trading stamp, and the original system giving rise to this regulation was pioneered by Spurgeon Hutchinson several decades ago, there was a third party... You have factual experience with this, but the Supreme Court case that described the mechanism talked about how these were stamps that were produced by a third party, not by the retailer who issued them. The retailer would purchase these stamps from the third party and issue them as a consumer loyalty benefit to the customer,  because they had to buy them from S&H. So when they issued them to you, the purchaser, they offset the cost of that stamp against their income, and you now have a premium coupon, something that, if saved up in the aggregate, entitles you to exchange this stack of stamps for what is called a gift at a redemption center. I personally have not seen these, but my understanding is that it was a store that doesn't take money. It's a store that takes stamps. So they serve as sort of a quasi-currency. You could not go into a Spurgeon Hutchinson redemption center and buy something with dollars. If you wanted a toaster, you would have to provide these stamps in sufficient quantity to earn the toaster. And that is a very different model from a discount, which requires a second purchase, which requires the provision of consideration by the consumer before the discount can be of value. And what the tax court found was that the price of gas actually was material, because the correlation between the availability of a tank of free gas on any given day and your fuel perks depended on what gas cost. If it was $2 a gallon, and you had $2 worth of discounts accumulated, you would get a free tank of gas, but if it was $3 a gallon, you wouldn't. And if the get-go is always $0.12 higher than the station across the street, why am I going to go there for my $0.10 off? Or if some other gas station maybe partners with a different retailer and you get frequent flyer miles, or there's some other correlation. There are many motivators of purchasing behavior here. But you reject the notion that there should be matching with the grocery sales. We do. But how do you account for the fact that the independently owned grocery stores are taking a 75% hit? They are... If the matching were not appropriate with the grocery sales, why in the world would the independently owned stores take a 75% hit? As a business decision or as a matter of law, Your Honor? As a business decision... I guess I'm interested in either, both of them. Well, I mean, if you put yourself in the position of an independent grocery operator, they're realizing tangible marketing benefits from flying the Giant Eagle banner. It is a well-respected local grocer, and they can count on consumer loyalty by participating in Giant Eagle consumer loyalty programs, even if those come at a cost to them. Even though they may lose $2 on every $50? Well, it wouldn't necessarily be a loss. Maybe they would make it up in other ways. The final 7% increase in sales, I guess. That was in the record, right? That was definitely in the record, that this was a booming program, that they had rarely had similar success with other marketing programs. Let me ask you this question about some Supreme Court case law. Why isn't this case identical to Gold Coast Hotel? Gold Coast Hotel was a casino operating under a Nevada law that required the payout of anything earned. And nothing was ever annulled for whatever reason. I think there was a year-long lapse. There were a number of particularities in that case that were associated with Nevada casino regulations. So there was a law or regulation that governed Gold Coast. Correct, as in Hughes Properties. I don't believe it was the same one, since I think that in Gold Coast, there were club points that were accrued every time you won. You had a win. Okay, so there was a law there. There's a contract here. We dispute the point at which the contract inheres here. Okay. If you agree with me that there's a contract here. Upon redemption of the discount, potentially. If you agree with me that there's a contract here upon the purchase of the groceries. If we posit that there is. Is your law under Gold Coast? Gold Coast does not control here. So you lose under Hughes. We would potentially not be in the best position under Hughes. Come on, it's okay. You may say you lose under Hughes. If Hughes were not completely aggregated by General Dynamics in the eventual enactment of 461H, yes, we would lose under Hughes. And if Gold Coast had been decided in the Third Circuit, you'd lose here under Gold Coast, right? We would still find Gold Coast distinguishable because discount coupons on gasoline are not a tightly regulated industry and there is no obligation to honor them other than the good business practice of an upstanding corporate citizen. All right, so if it all comes down to the timing issue, and that's a matter, as Judge Fischer just indicated, of contract law, if we're going to analogize the Nevada gaming regulation to contract law here, which contract law are we applying? Pennsylvania or Federal Common? I would suspect that this is, it's a Pennsylvania taxpayer and it's an issue of state law whether they're bound. I would distinguish the holding of the Federal Circuit in Mass Mutual, which again, you're dealing with insurance, which is a significantly regulated industry. And what they found in that case is that a policyholder had a contractual expectation that they would receive a policyholder dividend regardless of what was publicly declared. Here there is no contractual expectation that you are entitled to money. I mean, what I believe the taxpayer is suggesting here by saying, spend $50 with your advantage card and earn $0.10 off, they're suggesting that that's akin to a rebate, that that's money in your pocket. And our position is that it is not. I thought what they're suggesting is we're contractually obliged. And the reason we're contractually obliged is that when every customer who goes to fuel up at a get-go, who's already earned, say, $1 off per gallon, goes to redeem that and the pump tells them, sorry, we've canceled the program, then they're out of business. There's going to be a customer revolution because every customer that thought that they earned the dollar off was lied to. That is inconsistent with provision number four of the official rules and regulations, which says that the promotion is valid for a limited time and may end at any time without prior notice. All right, but what findings does the trial court make on that? What does that mean? It means that there is not a cost to anything. They say what that means is that, as I understand it, and I'll ask Mr. Barnes to clarify, they say what that means is tomorrow Johnny Eagle could explain to everyone in the four markets that we're done with fuel perks prospectively. But what that doesn't mean is that everybody who already accrued fuel perks don't get to redeem them and they have a contractual obligation to honor that. That is not what the tax court found and that we don't believe is implied by language that leaves open the right to revoke at any time without notice. Can you cite anything in the record or point us to where the finding was made by the tax court? Is that a factual finding or a legal finding? I would need to refer to the tax court opinion for the precise issue, which I can do in a moment. Were there findings of fact on that or was it just part and parcel of the opinion? Yes, Your Honor. It was not a specific finding of fact. It was the premise of their decision. Let's suppose that they did cancel or terminate the program and refused to honor the previously issued fuel perks. Wouldn't you then in the year in which that termination was made have a commensurate tax? There would be a commensurate income for the cancellation of the fuel perks that the IRS would be able to tax at the appropriate rate, it would seem. If they were correct on the deduction, you can't refuse then to honor a previously taken expense without paying tax on wiping out that expense. The position of the IRS is that the expense as accrued is illusory. There is no income realized from the cancellation of an expense that hasn't been incurred. But Mr. Barnes said in the courtroom this morning that they are subject to suit by holders of fuel perks if they refuse to redeem them. Your Honor, that's, again, inconsistent with the face of the agreement, which is what carries defense in such a situation. You say that commitment here in the courtroom, but should we consider that? I leave that to the discretion of the court. That is inconsistent with the face of their agreement and with the position certainly that the government and the tax court are taking. Okay. All right, Mr. Vetter, thank you very much. And we'll hear back from Mr. Barnes. You reserve three minutes for rebuttal, and we're going to keep you there. Thank you, Your Honor. I want to address a specific point that you have raised several times because it goes directly to what I think is really at issue. Under their very own regulations for the economic performance test and the recurring item exception, the IRS deals with rebates or refunds. And they say if the liability of a taxpayer is to pay a rebate, refund, or similar payment to another person, whether paid in property, money, or as a reduction in the price of goods or services to be provided in the future by the taxpayer, which is very similar to what we have here, they establish an economic performance rule for those rebates and refunds. But then in the recurring item exception, they say, and this is where Your Honor comes in, they say for rebates and refunds, presumptively match. They presumptively match the income with which they were generated. You don't even have to prove it. So under these regulations, which Giant Eagle relied upon and which its inside accountants relied upon and which its outside accountants relied upon, for both GAAP, generally accepted accounting principles, and for tax principles, we were entitled under these regulations to look at this definition of a rebate or refund, including providing a reduction in the price of goods in the future. Under this regulation, section 1.461-4, this regulation says this is what we're talking about. And then the recurring item exception says, you know when we were talking about these rebates or refunds or discounts on future purchases? That's presumptively matched against the income from which they were generated. So under regulatory law, which the IRS is bound to follow, we were allowed to do this even if all of these other things are not met. So when you get to the regulation level, this is it. It's right here. It's contemplated and they can't abrogate their own regulation, which is exactly what they're doing. And what the IRS tried to do in Massachusetts Mutual case, and what they're trying to do in other cases, is they're going to all of these taxpayers who have these recurring transactions, year after year after year. We have hundreds of thousands of transactions that are at issue. And when Congress changed the law in 1984 to add the economic performance test, the businesses complained and said, you are talking about changing standard accounting practices. Congress said, fine. If it's a recurring item and the match is good and it's going to resolve itself within eight and a half months after your year end, then stick with your current practices. And we've been deducting these things since the first year of this program in 2004. And we've deducted them the same way and the same method year after year. We're entitled to use a recurring item exception because this is exactly what Congress provided for. Mr. Barnes, one, I guess, factual question in this discussion. Ms. Avetta points out that the one fact that isn't fixed after I walk out with a fuel perk is the question of how many gallons of gasoline I'm going to buy. How do you deal with that in your estimate as to what your expense is going to be? Well, we use, as the court approved in Lukens, in Lukens for the supplemental employment benefits, they used economists and statisticians to estimate the future unemployment benefits years down the road. We've got a better system. And, in fact, the IRS has conceded that our system is so precise, it's reasonably accurate year after year after year. That's all built into the reasonable estimate. We don't know exactly how many gallons you're going to need the day that you pull up to the pump, but we can tell you within 1% to 2% precision, as a group, all of the customers are going to need a certain amount of gallons. And that's been conceded by the IRS. Is that part of the concession? Yes. It's the reasonable accuracy that's built into the calculation. And that was built into your expense calculation for the tax years in question. Exactly. So all we're talking about is the fixed liability prong. And that's an issue, that's a mixed issue of contract law. It may not even require enforcement under the Massachusetts Mutual Decision, Federal Court of Claims. It may not even need to be enforceable under state law. As Judge Roth has said, our general counsel testified in trial in this case that this was an obligation of the company, would be honored at all times. It would expose the company to enormous lawsuit risk to try and take away earned fuel perks. We would never do it from a legal standpoint. We would never do it from a business standpoint. And we would never do it from a customer goodwill standpoint. All right, Mr. Borens. Thank you very much. And we thank both counsel for excellent briefs and oral arguments, and we'll take the matter under advisement.